```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

ATLANTIC SOUNDING CO.                           CIVIL ACTION

VERSUS                                          NO. 05-2810

BRYANT CURETTE                                  SECTION "A"(2)
```

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for trial before the Court, sitting without a jury, on May 1, 2006.  Following the close of all evidence, the Court took the matter under advisement and instructed counsel to submit their post-trial memoranda no later than Monday, May 8, 2006.

Having now considered the pleadings, evidence offered at trial, arguments of counsel, and applicable law, the Court renders its Finding of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).  To the extent certain findings of fact are more appropriately classified as conclusions of law, they should be so construed.  To the extent certain conclusions of law are more appropriately classified as findings of fact, they should be so construed.

### FINDINGS OF FACT

Bryant Curette commenced employment with Atlantic Sounding

Co. on May 24, 2005, as an oiler.  Curette was assigned to the WEEKS 542, a rectangular-shaped barge with a living quarters on the back end and a large crane on the front end.  Curette's first 14/7 hitch was scheduled to end on June 6, 2005.  Curette had no prior experience with boats or dredging operations.  Curette's training was "learn as you go" on the job at the direction of co-workers.

On June 3, 2005, the 542 was conducting dredging operations on Bayou Postillion.  Curette had been working aboard the vessel a little over a week.  Jimmy Thompson, an operator assigned to the 542, was operating a marsh buggy on a nearby bank.  Curette was with Thompson helping him grease the machine.  A hydraulic hose broke on the marsh buggy and Thompson decided to refuel the marsh buggy himself while waiting for the replacement hose.  The diesel fuel was kept on board the 542 so Thompson took a small cab boat from the bank to the 542.  Thompson had never previously retrieved the diesel himself.  Curette accompanied Thompson on the cab boat.  As an operator, Thompson was considered Curette's superior and was supervising him during the operation.

Thompson piloted the cab boat.  Thompson pulled up next to a cleat or "bit" or "tie-down" located on a wide yellow line used to delineate the swing radius of the crane (left side of vessel). There is another cleat located on the same side of the barge behind the spud but no other cleat was located in the area where Thompson pulled up with the cab boat.  Thompson perceived that

2

the yellow cleat would be easier to access.  Thompson also thought that he had seen other crew members pull up to that same cleat.  Thompson could not pull the cab boat on the other side (right) of the barge because it was too close to the bank.  Thompson could have, however, pulled up to the second cleat on the left side of the barge.

Thompson instructed Curette to get out of the cab boat and to tie it off to the 542.  Given the location of the cab boat and the length of the rope, Curette had no choice but to tie it off at the yellow cleat.  Curette knew that the yellow line represented where the crane sweeps out and he knew to be cautious around the yellow line.  Curette's back was to the crane as he hurried to tie off the cab boat.  The crane's engines were running but the crane was not moving when Curette first began tying off.  Curette was standing on the yellow line when tying the cab boat and when he stood up the crane swung around and knocked him into the water.

Curette cannot swim and he was not wearing a life vest at the time of the accident.  Thompson could not help Curette out of the water so Curette eventually pulled himself up into the boat. Thompson had the cab boat's engines in reverse in order to position the boat next to the 542 so Curette was forced to grab onto the cab boat with one hand while pushing the side of the barge away with the other.  Curette declined to fill out an accident report for fear of losing his job given that he was on

3

his first hitch as a new employee.  Initially, Curette did not believe that he had sustained an injury.  Curette left the 542 that evening, with the captain's permission, to seek medical attention for a rash.  Curette's departure that evening had been planned prior to the incident.

Curette started to "tighten up" on the way home and woke up the next morning with "extreme" pain in his lower back and arm. Curette tried to call the captain of the 542 to let him know that he would not be returning to the 542 that day because he was in such pain but Curette could not get through.  Curette finally reached the main office which sent him an accident report to complete.

Curette presented to Dr. Freddie J. Fandal, who practices family medicine, on June 6, 2005.  Curette presented with upper extremity tenderness and some swelling.  He also complained of generalized low back pain and pain down his left lower extremity, starting from his lower back.  He complained of aches and pains generalized over his entire body, and also had a rash on his wrists and an infection on his buttocks.  Dr. Fandal conducted a physical examination of Curette and concluded that Curette had generalized lower back pain.  Dr. Fandal prescribed over the counter Ibuprofen and Lortab 7.5 as needed for the pain.  Dr. Fandal opined that it was more probable than not that Curette's low back pain was related to the June 3rd incident.  Dr. Fandal did not recall restricting Curette from returning to work and Dr.

Fandal gave Curette a return-to-work slip for June 13, 2005. Curette did not return to see Dr. Fandal after June 6, 2005.

Curette presented to Dr. Michael Burnell, another family practitioner, on June 7, 2005. Curette complained of low back pain, progressive soreness to his low back area and his mid/upper back. Dr. Burnell conducted a physical examination of Curette and concluded that he was having some spasms in his lower back. Curette also had some abrasions to his anterior legs and hands, with a lot of point tenderness. He was diagnosed with lumbar strain and spasms. Dr. Burnell prescribed Lortab (higher dosage) for the pain. Dr. Burnell opined that it was more probable than not that Curette's low back pain was related to the June 3rd incident.

Curette continued to see Dr. Burnell on a regular basis through September 19, 2005. On June 22, 2005, Dr. Burnell prescribed physical therapy and on August 4, 2005, Curette had an MRI because he continued to experience pain. The MRI was essentially normal and Curette eventually responded to the physical therapy. Dr. Burnell opined that Curette likely had a severe strain or soft tissue injury to his lower back and there was no question in his mind that Curette's complaints of pain and discomfort were genuine. Dr. Burnell released Curette to return to work on September 19, 2005, and he did not believe that Curette could have returned to work prior to that date.

Curette was the only witness to testify live before the

Court at the trial on the merits. The Court found Curette to be a truthful witness and credits his testimony as to the June 3rd incident and its aftermath. The Court was also impressed by Dr. Burnell's testimony, which was provided to the Court via deposition transcript.

The Court concludes that Curette did sustain an injury as a result of the June 3, 2005, incident, and that Curette could not safely return to work until released to do so on September 19, 2005. Curette sustained medical expenses totaling $7,803.25 as a result of the June 3rd incident.

## **CONCLUSIONS OF LAW**

The Court has subject-matter jurisdiction of this matter under the Jones Act, 46 U.S.C. § 688, and under its admiralty and maritime jurisdiction, 28 U.S.C. § 1333(1).

At the time of his injury, Curette was employed by Atlantic Sounding Co. as an oiler assigned to the WEEKS 542, a vessel operating on navigable waters. It is undisputed that Curette was a Jones Act seaman.

Atlantic Sounding owes Curette cure in the amount of $7,803.25, and maintenance for the period of June 4, 2005, through September 19, 2005 (108 days) at $30 per day, which is a reasonable rate under the circumstances. The Court credits Curette's testimony as to the regular financial contribution he made to his mother's household. The total maintenance award is therefore $3,240.00.

The Jones Act provides a cause of action permitting unlimited damages against the negligence of a plaintiff's employer. Becker v. Tidewater, Inc., 335 F.3d 376, 386 (5th Cir. 2003) (citing Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 522-23 (1957)). The Jones Act imposes liability on the owner of the vessel for injuries or death resulting from negligence whether of the owner directly, vicariously for the acts of employees who are not seamen, or vicariously for the acts of the master and members of the crew. Ivy v. Security Barge Lines, Inc., 606 F.2d 524, 525 n.3 (5th Cir. 1979).

Atlantic Sounding is liable for the injuries sustained by Curette because Thompson drove the cab boat to the cleat that was located within the swing radius of the crane and instructed Curette to tie the rope onto that cleat. The Court credits Curette's testimony that due to the location of the cab boat and the length of rope he had no choice but to stand within the confines of the yellow line. The Court also credits Curette's contention that he had to act quickly to secure the cab boat in order to avoid being pulled into the water. Thompson was well-aware of the significance of the yellow line and Thompson could have pulled the cab boat up to the other cleat located on the same side of the barge. Thompson was the senior employee on the scene and Curette, who was new on the job, was following Thompson's instructions.

Moreover, the Court finds unconvincing the fact that there

7

was no hurry to refuel the marsh buggy.  Curette had nothing to do with the decision to refuel the marsh buggy but was acting at Thompson's direction.

Under the circumstances Curette was no more than 5 percent at fault for his injuries.  Curette had no choice but to stand within the danger zone of the crane in order to tie off the boat at the yellow cleat.  However, Curette was aware of the significance of the yellow line and did turn his back to the crane.  Further, Curette knew he could not swim and his injuries might have been less significant if he had been wearing a life vest, although there was no evidence presented to that effect.

Curette is entitled to recover $20,000.00 for pain and suffering and $9,802.80 for lost wages.  This amount shall be reduced by 5 percent.

The Court does not find that the 542 was rendered unseaworthy by the location of the yellow cleat.

Under admiralty law, Curette is entitled to prejudgment interest on all past damages at the rate of six percent per annum from June 3, 2005, until paid.

All court costs are taxed against Atlantic Sounding Co.

New Orleans, Louisiana, May 16, 2006.

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE